Good morning. Ralph Harris for Bayview. I intend to argue just the bailment issue, and Ms. Tiffin will argue the accord and satisfaction issue. I intend to take ten minutes, and we intend to leave five minutes for rebuttal, and I'll take any questions that you have as I go. In addressing the bailment issue, I'd like to focus my comments on two issues. First, how did the Bankruptcy Court error in this case? And I need to discuss that briefly to get to the second issue, which is why was the Bankruptcy Court's error prejudicial? So I'd like to touch on those two issues and respond to your inquiries as we proceed. In this case, what the Bankruptcy Court did was erroneously hold that, and I quote from the Bankruptcy Court, the law of bailment requires there must be an express or implied agreement, and it goes on to state, the court struggles to find the implied agreement on the part of CWCapital to create any bailment relationship. But as the many cases that we brief point out, a bailment may arise from an agreement, but a bailment may also arise when there is no agreement. Secondly, the Bankruptcy Court mistakenly limited the bailment cases that involve money or proceeds of a check only as falling into one of the following two groups. One, the delivery and acceptance of actual cash, not fungible other funds, and that's not really relevant to our case. And two, and I quote, where a lender delivers loan proceeds with an instruction letter setting forth the express conditions for using those proceeds, which conditions have been expressly approved by the recipients. Here's the point. What the Bankruptcy Court was saying is that in prior cases that he could see, there was an instruction letter. Therefore, in order to have a bailment of checks or money, there must be an instruction letter. But that's not the law. What the Bankruptcy Court did in this case was apply a too restrictive analysis of what bailment is, and in the words of the Bankruptcy Court, it's a bailment by definition is some sort of agreement, whether actual, implied, or constructive, that the bailee who gets the property to hold will deal with it in some way that the bailor wants. It isn't just handed over. And regardless of whether there's an instruction letter, what here would show that there are any instructions, wishes, specifics about how the purported bailee is supposed to handle the property? Excellent question. Here's the response, Your Honor. In this case, you have a commercial lender, the trust, that is represented by commercial loan servicers that are in the business of receiving payments, monthly payments, payoff payments. When the payoff statement came in in this case, it was found by the trial court and agreed to by the trust and its servicers that they knew this was for a loan payoff. They knew that. And that was found by the trial court. So they knew it was for a payoff. Right. And it was phony, right? I'm sorry? Wasn't that the thing that was phonied up? Therein lies one of the most significant issues in this case. The bankruptcy court, the trial court was correct in stating that the payoff statement was phony. It was by all accounts suspicious. Therefore, the trial court wanted to disregard that document when it came time to making a contract analysis because, as is correct, a fraudulent document can't be used to create a contract. But it can be used to show conditional delivery of a check. It can be used to show the circumstances. And that goes to your point from just a moment ago. Here comes Well, isn't the real problem that nobody did their due diligence? Nobody paid attention to the fact that there was something obviously wrong going on here and didn't protect themselves. I mean, that's ultimately the issue, right? Well, I don't know if that's ultimately the issue, but the trial court did find that neither side particularly distinguished themselves. And we then argued sort of a last clear chance type of analysis, and the court ruled against us on that. And that aspect of the case is not on appeal. It's not being appealed. What we are appealing, what I'm here to discuss, is the bailment issue. Let me, if I may, direct you to, you commented a moment ago about what a bailment is. Let me suggest that in determining what a bailment is, you might contrast the language in the Alitalia case that was discussed in the BAP ruling, which contains the phrase, when justice so requires. That is to be used according to that case in deciding whether a bailment exists. I would suggest that you contrast that case with some of the other cases that we have cited in our briefs, including the FADA case and the case In re Bath discussed, cited in our materials. In those cases, a slightly more enlightened discussion takes place. With regard to when you should and when you can find a bailment. And in particular, if I may, the following language is contained in the FADA Industries case. And this gets to the policy level of when do we find a bailment or when should a bailment be found. The case, the court says the determination as to whether the relationship is one of bailor and bailee turns on a number of circumstances. And it discusses them in some detail rather than leaving it to a more imprecise definition of when justice so requires. And during the course of that discussion, it says, it is the element of lawful possession, however created, and the duty to account for the thing as the property of another that creates the bailment, regardless of whether such possession is based on contract in the ordinary sense or not. What do we have in this situation to indicate a bailment? A check for $1.15 million comes in. The stub of the check sets us for a payoff. It's attached to a payoff statement. It's not the money of the processor, the loan servicer. They're either going to accept the money and issue the lien release, or perhaps they'll reject it. But either way, they're dealing with the property of another. Well, they did reject it. And so they rejected it, and there's an expectation either way that they're going to be accounting for this money, one way or the other. And they thought, well, this looks like a payoff by silver or sand, so we'll just send it back, the money. They didn't send it back. Well, they sent it back to who they thought originated. The issue is here, was a bailment formed? Number one, there was property of another received under circumstances where something was to be done with the property and an accountant. Was there any indication that this money came from Bayview? The name Bayview was not on the check, Your Honor. It was not. However, we do have an escrow check, and the trust, through the information acquired by its agents and employees, a servicer was aware there was a refinance in the wind. Mr. Amenia, one of the representatives of the servicer, testified he knows that a refinance means another lender is going to supply the money. The name Bayview, you're correct, was not there. But here you have $1.1 million from another. So what you're saying is the fact that it came from the escrow account should have put the trust on notice that this money did not come from Silver Sands? I think that's correct. Your Honor, let's not lose sight of the fact that there was a disputed fact that was resolved at trial, and that is the suspect payoff statement was the trust's servicer receives a check for $1 million-plus attached to a document that they claim was suspect. What were their options at that point? I'm sorry? What were their options at that point? You would think that if they receive a document and this was what was found by the trial court, I mean, the language of the trial court was the payoff statement, which was attached to the check received by the trust, was fraudulent, so it cannot constitute the requisite delivery. Therein lies the rub. The bankruptcy court was rejecting probably the most relevant information in the case, ruling only that there is no bailment when there's merely a cashing of a check. That's the beginning and the ending analysis of the bailment issue, and then doesn't really deal with the analysis of whether a bailment should exist. Did Bayview do anything to reach out to CWM or CMW, CWM, the servicer? Anything? The escrow officer called the servicer, said, where do I send the payoff statement? Got the information, packaged up the check, stapled it to the payoff that had Capmark's logo on it. Now, it wasn't in the right place, but they wouldn't know that. And they packaged up the payoff statement and the check. They sent it to the trust servicer who takes the check, detaches it from the payoff statement that they claim was falsified, caches the check, spends $14,000 to bring their own loan current, and then writes another check on their own account to the debtor that gave the money to the debtor, Mr. Gregg and his company SSRV. Mr. Gregg attempted to give the money back with the explanation that it's a payoff, and they said, no, you keep it, and the money was dissipated. We think the issue here is, was the trial court incorrect to dismiss the bailment claim? And we think it was. I'd like to leave some time for rebuttal, and I'll have my colleague address the issue of the accord and satisfaction. Thank you. Thank you, Your Honors. Good morning. May it please the Court, my name is Anne Tiffin. I'm the attorney for G&G. And as Mr. Harris indicated, I'll be addressing the issue of accord and satisfaction. What I'd like to do, Your Honors, is walk you through the undisputed facts that allow this Court to make a de novo review of the trial court's rejection of accord and satisfaction. Because, as you know, under the Bammer case, if there's a legal conclusion informed by historical facts, it's a de novo review. And that's what we have here, because the facts on which accord and satisfaction is based are not disputed. There are three elements of accord and satisfaction. Dispute, tender and full satisfaction, and acceptance. We have all three of those. Dispute, Your Honors, is shown by, is shown by Mr. Newman. Newman, Ross, Mr. Ross Newman said, I'm the one in charge. That's ER 693. He knew the borrower intended a refinance and a prepayment. That's ER 699 and 701. So did his analyst, Mr. Amenya, ER 1454. Mr. Newman had the power to allow a prepayment regardless what the documents provided. That's ER 729. He gave an appraisal, 450. He gave a payoff, he promised a payoff statement, ER 391, and he never told the borrower he can't do this. So he led the borrower to believe, and the borrower did believe, that he could prepay it. And that's at ER 1467. Also, April Blair testified that when she, after she redirected the money in a manner it was not conditioned for, she called him up and he was argumentative. That's ER 1368. He thought he could prepay it. That's the dispute. And, Your Honors, the dispute does not have to be about the amount. It usually is. But under the red alarm case, the Ninth Circuit, this circuit specifically found a dispute in that case over the terms of the agreement, not the amount. So we've got the dispute on undisputed funds. Sotomayor, what is your response to the BAPS discussion of this issue in which their analysis was that regardless of everything else, there was no meeting of the minds, which is a requirement for accord and satisfaction? Thank you, Your Honor. That's a good question. The answer to that is that a subjective intent to not to agree with the conditions on which a check is presented is irrelevant if the, if the, if the But they point out that there was no communication among the parties that could have led to a meeting of the minds. Well, you don't need a meeting of the minds. That's the important point I'm trying to make. When a check is paid, is tendered with conditions attached. Accepting it with those conditions attached constitutes acceptance. There's no requirement for an actual subjective assent. The Flagle case, the Frank Culver case, and the Teledyne case all stand for that point. So when But I guess I have difficulty about, about that, the alleged acceptance. There was a no prepayment clause, correct? So this check violated the no prepayment clause, and both the bankruptcy court and the BAPS pointed out that your respective clients basically did no due diligence to find that out. And so they're stuck. I mean, that's, that's kind of a rough and ready summary of what they said. But what's wrong with that? Well, first of all, Mr. Newman, who said he was in charge, and that's undisputed, also said, and this is undisputed, he had the power to allow prepayment notwithstanding the terms of the note. So even doing due diligence wouldn't have answered the question that Newman had the power to do it, and he gave the impression he was going to do it. Also, the, under the, oh, the trust could have, they didn't have to accept the condition. But in that event, they would have been required to return the check to the payor. In Teledyne, the payee did exactly what the trust did in this case. The payee accepted the check knowing the conditions, violated the conditions, applied a payment, sent the rest, or not, did not send the rest back. They accepted the check, and accord and satisfaction was found. Subjective assent is not necessary if you accept the check knowing the conditions on which it's tendered. If Your Honors have no further questions about accord and satisfaction, I'd like to leave some time for rebuttal. Good morning, Your Honors. May it please the Court. My name is Heather Foley. I'm here on behalf of the Appellee Bank of America as trustee for the Asset Securitization Corporation Trust. As this Court is well aware, these issues were fully litigated over a period of time, and the Court of Arizona then briefed and argued before a panel before the bankruptcy appellate panel. There were courts all the time after trials, so why don't you go on with your argument? I certainly understand, Your Honor, but my point is these issues have been raised and vetted, and these arguments present nothing new. You wouldn't be here if they hadn't been. Correct, Your Honor. Why don't you go on and talk about—I mean, the fact is your client is the one who's responsible for the fact that that million and a half was wasted. They get a check. They cash it. There's every indication that there's something wrong with it, and they don't return the check. They don't send the check back to the party that sent it. They send it to a third party. And why should they be the ones who walk off with no liability at all in this? Well, Your Honor— It just strikes me as a wholly incorrect result. Well, Your Honor, I— You know, the fact that the bankruptcy judge said, oh, I'm not even going to look at that note because it's a forged document, just strikes me as lunacy. Your Honor, I respectfully disagree with part of your characterizations in terms of the Why don't you tell me why? Because that's what it looks like to me. They got the money, right? They could have looked at the check and said, whoa, we don't accept prepayments. We're not going to cash this check. We'll just tear it up. They could have done that, right? But they didn't simply cash it. They could have done that. No, Your Honor. Why couldn't they have torn up the check? Because, again, on the face of the check itself, as Bayview has conceded, there's no indication as to who the check came from. The expert witness at trial— I'm sorry. Whose check was it? It was a check drawn off of an escrow account from Transnation Title Insurance Company. So is the fact that it comes from an escrow account that doesn't tell you that that comes from the escrow account? It comes from an escrow account, yes, Your Honor, but it doesn't indicate that it's a refinance and that there's another lender. Both the witness on behalf of Transnation at the trial level as well as the trust's expert witness— But they knew it came from the escrow account. They could have returned it to the escrow account. They could have not cashed it, right? They certainly will— They could have not cashed it. In terms of cashing, Your Honor, no. It is industry standard as the expert testified as the Bankruptcy Court found. It goes into a suspense account. Yes, Your Honor. It was deposited into a suspense account. There's a litany of cases dealing with checks being deposited sort of by into a suspense account, by an accounting department, sort of in order to determine how to deal with the money. So in this process— It's equivalent to essentially an internal escrow while you figure out what to do with it, as I understand it. Correct, Your Honor. It was not applied to the debt. It's to determine what to do with it. So in light of that, the asset manager did what it was supposed to do, which was to contact the borrower and say, wait a minute, we have this check. It appears that you're trying to do something that is expressly prohibited by the loan documents. There was no indication that the loan documents were ever modified. You know, G&G has argued that— And what about that fraudulent release? The fraudulent payoff statement, Your Honor? Yeah. Yes, Your Honor. That statement in and of itself, as the Bankruptcy Court and the Bankruptcy Appellate Panel found, had numerous indices of fraud on its face. Shouldn't that have caused them to be wary and say, wait a minute, this is really something fraudulent going on here, and we ought to be careful about what we do with this money? Well, there is no indication in the record and there was no finding that April Blair, the asset manager, who was who reached out to the borrower when this money came in. But you don't just ignore it. The Bankruptcy Court said, oh, it's fraudulent. You don't take it into account. No, Your Honor. You take it into account and you say, what's the reasonable thing to do with it? But, again, the testimony was a dispute of fact, although the Bankruptcy Court, I will acknowledge, found that it was stapled to this check. There was a dispute of fact. There was no testimony. There was no evidence that anyone at Capmark ever reviewed that check prior — I mean, that payoff statement prior to 2008. Why weren't they required to do it? Why shouldn't they have done it? They got it? I mean, the Bankruptcy Court says just ignore it because it's fraudulent. To me, it seems to me that if it's fraudulent, that's the last thing you would do is ignore it. I don't think the Bankruptcy Court said that at all. The Bankruptcy Court said two things. One is that fraudulent payoff statement was in the possession of Bayview and Transnation as its title company before this closing ever occurred. There were a number of red flags, a number of things that to any person, even a lay person, would have jumped off the page as being incorrect that should have raised flags. For your client? That should have raised flags for them before they ever funded and closed the loan. As Judge Benson points out — But it raised flags for your client, right? Well, again, that's before it ever comes to my client, Your Honor. Sorry? That's before it ever comes to my client. My client did not provide it. There's no evidence that they provided it. There's no evidence they had any communications with Bayview or Transnation prior to this loan closing. And as Judge Benson correctly pointed out, Bayview did nothing, Transnation did nothing to contact the lender, to see if the loan could be prepaid, to discuss the payoff statement, to question the inaccuracies in the payoff statement. What happened is that the disputed testimony at the trial court level, and again, I will acknowledge the Bankruptcy Court found, was that somehow that payoff, fraudulent payoff statement, which everyone acknowledges is fraudulent, was stapled to the check. The check on its face had no indication of Bayview. The payoff statement has no indication of Bayview. It doesn't indicate that it's a refinance. But it does indicate the fact that it comes from a trust account, that the money originated with somebody other than the borrower. Well, not necessarily. Or else it wouldn't come from a trust. If the borrower has the money, it just pays itself. In fact, it comes from a trust account. I'm sorry, from an escrow account. You shake your head, but you haven't heard the question. Not necessarily, Your Honor, because, again, as the witness ---- If it comes from an escrow account, doesn't an escrow account suggest that the money came in from somebody other than the borrower? Not necessarily, Your Honor. Again, it could be from the sale of another piece of real estate that was somehow escrowed with a title company and then turned over. And that was acknowledged both by our expert witness and the witness for transnation who testified at the trial level. If there's nothing, it indicates, yes, it's an escrow check. But it doesn't indicate the source of the funds. It could have been another sale of property. It could have been some other source of funding. But it doesn't indicate that there was a ---- Nothing prevented your client from sending it back to the escrow? Your Honor, again, I disagree with that. I think my client did what was prudent and reasonable to ---- I'm asking you a question. Is there anything that prevented your client from sending the money back? Yes, Your Honor. My client spoke with the borrower. The borrower never mentioned there was a refinance, never said Bayview was involved. They said take the money out that you're past due and owing on the monthly payments. Do you understand the question? I do, Your Honor. Is there anything in law or otherwise physically that prevented your client from sending the money back to the escrow? Again, Your Honor, at that point the check had been put into ---- I'm asking you a question. If you don't want to answer it, this is going to be the last time I ask it. Is there anything that prevented your client from sending it back to the escrow? Yes, Your Honor, I believe so. Okay. Tell me what. And what I'm explaining to you is at that point the money had been put into a suspense account. And what the trust did, what its agent did was contact its borrower. It did not have a relationship with Transnation. It couldn't call Transnation and say what is this money for, is this the borrower's money. It was essentially a banking type fiduciary relationship with the borrower. It went back to the borrower to determine why these funds had been remitted and what needed to be done with them. What is it that precluded from sending it back? I understand they didn't want to or they had good reason not to, but is there anything that precluded it from sending it back to the escrow? I mean, you know, point me to a statute, point me to a case, you know, point me to something that said no, doing that was not a permissible cause of action. Your Honor, I assume that that is a possible cause of action. I don't know that it was, again, required or that there's anything that expressly I didn't say required. Did you understand the question? I did not. Is there anything that precluded them from sending it back to the escrow company? Precluded means is this something they would not have been entitled to do, would they not have been able to do? They would have violated some law, some contract or something? I don't think it would have been violation of a law, Your Honor, but again, their obligation, the money is already in-house, if you will, in suspense at that point. Isn't the answer to Judge Kaczynski's question that in the most literal sense it could have been put back in an envelope and sent back, but the industry standard that was testified to is that it should be placed in a suspense account, and if it's unknown, then you go back to the borrower? Yes, Your Honor, and again, that's my — is at that point it had already been placed into a suspense account. Could it physically have been put back in an envelope and returned that same day? Well, but once it's been placed in a suspense account, it's placed in a suspense account to figure out what to do with it. Correct. But what was it — what in the record is there about sending it back to the escrow that precluded it or made it contrary to standards or whatever? Again, there's nothing — Is there anything in the record saying that at that point, once they put it in a suspense account, they could have — that would have precluded them from sending it back to the escrow, or that it was contrary to practice or anything? And that's my point, Your Honor, is nothing expressly precluding it, but it was industry practice and custom to contact your borrower. You get payment in on behalf of a loan. There was an indication on the front of the check that it related to a specific loan. That's how they were determined who to contact. They contacted the borrower. The borrower then gave them additional direction. The borrower never mentioned Bayview, never mentioned the existence of a refinance, a second loan, and instructed — and then made an affirmative instruction to take money out to bring the loan current and return the balance to me. And again, that was — I mean, could they have contacted Transnation? I'm sure they could have, but they could have done any number of things. They — like you said, they could have torn up the check and thrown it away, but that's not — Well, that brings us to the bailout cases. Why isn't this a bailment case? And why isn't your client liable for a — for mishandling the bailment? Your Honor, this is factually distinguishable from each of the bailment cases. In fact, Bayview mentioned earlier to this Court the Bath decision out of the Eastern District of Pennsylvania. But what their brief omits and what their discussion omits is that in that instance there was a bailment determined, but the party to which the bailee, if you will, had signed an acknowledged agreement limiting the use of the funds that were loaned. We did not have that here. There was no — Can I interrupt you? I would love to hear the answer to that question. I know there are other cases, but in this case, why wasn't there a failure to comply with the bailment? Okay. First of all, if it was an implied bailment, there would have to be some sort of implied contract, that there was an obligation to — what was the purpose of these funds? It doesn't take much for a bailment. You leave your purse in a restaurant. There's no contract. If they take it and they say, oh, we're going to throw it out in the street and, you know, toss it out, they've violated the bailment. It's an involuntary bailment. It's not set on a contract. It's implied in law. And why isn't this exactly that situation? Like, they get a million and a half dollars of somebody else's money, and then they handle it negligently. They ignore the red flag that there's a fraudulent item attached to it. I mean, obviously, this was no such release because they didn't sign it. It was their own release, right, that was involved there. That should have set off red flags. Why isn't that just like tossing the purse, you know, into the street? Because the type of bailment Your Honor is describing is a constructive bailment. There is no underlying agreement. And, again, we believe — But that's true if you leave something in a restaurant. Correct. They can't just throw it in the street. They're responsible. Even though you have no agreement at all, they are responsible for treating it in a responsible way. And they did just that, Your Honor. They treated it in a responsible way. You agree that they had a duty to treat it in a responsible way? I do, Your Honor. And I think they took the reasonable steps. They contacted — Slow down. Just slow down. You agree that they had a duty, even without a contract, even without an agreement, they had a duty to treat it in a responsible way. That was their — they became a bailee, and they are responsible for treating it non-negative. No, Your Honor, I don't think they became necessarily a bailee and had a duty to — Okay, then why don't you explain to me why not? Because I think that they — again, the way the funds came in, without any sort of indication as to the source of them, they acted responsibly in the sense that they reached out to their borrower. They weren't aware of this other one. But that goes to the question of whether they acted responsibly. You are disputing, I hear you, that they were a bailee at all. That's what you just said, and I'd like to focus on that. Correct, Your Honor. Why are they not a bailee? Because, again, I think — I've indicated there's no — I don't believe there's any implied contract here. So I think you're left with a constructive or an involuntary — To whom was the check made out? The check was made out to the trust, to the lender. So when the trust receives a check made out to itself, you're saying that there's no indication that it belongs to anyone else and therefore there may be a requirement to be responsible, but it isn't a bailment. Correct, Your Honor. They were the payee. Why is that? Because they were the payee, and there was no — Okay. And typically in a bailment, you're required to return things, as you said, if your pocketbook's left somewhere, that when the check is sent to the trust and made payable to the trust, it's not a bailment. The intent of Bayview — Let me say to you, why is that? Why is that any different than putting money in an envelope and sending it to the trust? And it turns out to be, instead of sending it to this place, you send it to — you know, it gets misaddressed. Because — And it comes in with a letter saying this is addressed to the Smith Trust and this is the Jones Trust. Because as a payee of a check, and I believe that the bankruptcy appellate panel had it correct on treating the check and the proceeds as two different things. We don't dispute that you can bail — Why? Why? Why? Why do you treat them as two different things? I don't understand. You say the piece of paper is a bailment, but not the underlying funds? Correct, Your Honor. There would be two possibilities here. What's the authority for that? You could bail a check. What's the authority for that? Again, Your Honor, it was — there is the uniform commercial code that's been adopted by the Arizona, which is Section — my apologies — 47-3408 of the Arizona Revised Statutes, which is what the bankruptcy appellate panel — So this is 47-3408? Correct, Your Honor. Okay. And it — Let's read this together. What does it say that helps you? I don't know that I have the full verbiage of it. It says a check or other draft does not of itself operate as an assignment of funds in the hands of the drawee. Correct, Your Honor. And the point in terms of a — Okay. Now that's what it says. How does that help you? In terms of a bailment, a check is a negotiable instrument. When it was made payable to the trust and delivered to them, it was not for the purpose of creating a bailment. Once it was — No, but this is what happens with involuntary bailments. There are never things that are intended to be created. When you leave your purse in the restaurant, you don't intend to create a bailment. They don't intend to be bailees. This is just something that happens out of circumstance. So I don't see how this helps you at all. Because, Your Honor, I believe that, again, a negotiable instrument, when it's made payable to the person and they transact that instrument by putting it into a suspense account, you haven't created a bailment-type situation. Well, you say that, but what is it about this section? You just cited the section. And you're going to tell me why this section helps you reach that conclusion. Why? What is it? Because, again, the check is a negotiable instrument. It's made payable to the payee. I know what a check is. I was lost. The payee transacts it. That money then transfers to the payee. The question is, are those funds — But if it transfers the bailee wrongly, why aren't they responsible, just like any other in a way that's responsible? What is the fact that it's a check? What difference does that make? What difference does AR-47-3408 make? I don't get it. Because, again, once it's made payable to what you're presupposing is a bailee and they negotiate it, that is not — that's not the typical bailment, where we're lawfully holding property of another. If it's made payable to the payee and that payee negotiates — Isn't the point that if it's made payable to you, it's not property of another? If I hand you a check for $20 made out to you, I have handed you not property of another. I've handed you something that is yours because you're the payee. I'm entitled to negotiate. It's not as if the check was fraudulent. Is that your point? It's not as if — yes. I'm sorry. Is that your point? Yes. So, in other words, if I make out the check to you, thinking I'm making out the check to somebody else, that means it's now your money and you have no responsibility for it at all just because it's a check? What if I hand you $20 and say, here, John Smith, here's my $20 in payment for the debt I owe you? Then it's your money? Two separate things, Your Honor. One is — Let's start with the money. I hand you the money and I think you're John Smith, and I say, hey, John Smith, here's the $20 I owe you. That becomes your money? Again, are you presupposing that there is a debt, that there's not a debt? I mean, I want to make sure I understand your question. Nothing that I owe you. I just think you're the wrong person. And I hand you $20 and say, here's the money I owe you. And I don't owe you anything. I actually owe somebody else the money, but I just am confused as to who you are. And I hand you the $20 and I say, here, John Smith, this is for the $20 I owe you from last Friday. And I believe those, again, would be the misdelivery cases where you're delivering it to someone. You don't have to rephrase the question. You don't have to rephrase the question. It should be pretty clear what I'm asking. Is your answer, is that now your money because I've handed it to you, or are you a bailee? No, if I had no right to the money. If you're saying that there was no debt — You have no right to the money. There was no debt owed to me. Exactly. And you mistakenly thought who I was and handed me the money, then no, I don't believe that — Okay. So let's say, in fact, instead of doing that, I give you a check. Payable to me or to some other party? Payable to you. And I think I made a mistake in writing out the check. Different result? Well, again, if you've made the check to me, I think it is a negotiable instrument and the ability for me to negotiate that. That makes it your money. Whether I owe you anything at all or not, I hand you the check with your name on it. That becomes your money. You are $20 richer. I think, again, Your Honor, I don't think there's — I'm asking you a question. I mean, is that — And I'm trying to answer your question because I want to make sure I understand it. Is, again, I think that that check becomes payable to me as the payee. There's nothing wrong with me cashing it. Do I think that the funds from that check then become my money? No, not necessarily. And I think there's a distinction there. So if it's not your money once you cash it, who's — what is your status with respect to that? Well, at that point, if you had handed me — Why don't you let me finish? Why don't you let me finish my question? You have now cashed the check, okay, which you're entitled to do because your name is on the check, and you now have the money. Is that now your money? Again, assuming that there's no debt owed, then I know who the bailor is. I know your identity. I would then have to, I think, return the funds to you. I'm asking you a question. Is that your money? Again, if it's been improperly paid to me, no, I don't believe those funds are mine. Okay. So the fact that it was paid by check as opposed to cash doesn't make any difference. So why is this any different? Because, again, Your Honor, I think that what the distinction the bankruptcy appellate made was you can bail a check, but in this instance the check was made payable to the payee. It wasn't a bailment. It was negotiated. The question then becomes were the funds subject to a bailment. And, again, based on a constructive bailment, because we believe that there was no implied agreement or otherwise expressed agreement, that based on the equities ---- The money did not come from Silver Sands. It's not like they got the money from the debtor. They got it from a third party. But that was not known to the trust at the time. The trust was unaware of the ---- They knew it was a third party. No, they did not, Your Honor. I'm sorry. They didn't know that the escrow was a third party? Again, not necessarily, Your Honor. As I explained earlier and as was indicated in testimony at the trial by both an expert and an agent of Transnation, that that ---- there was ---- the fact that it's an escrow check does not mean there's a new lender, that there's a third party. Mr. Gregg, the principal of Silver Sands, who did in fact own other pieces of real estate, could have sold a real estate through an escrow, could have closed and held that money in escrow, and then decided he wanted to pay off the trust. So there's no indication other than the fact that it is an escrow check as to the source of the funds. And it's got that fraudulent thing attached to it. I'm sorry, Your Honor? And it's got that fraudulent document attached to it. Again, that was the finding by the Bankruptcy Court. The evidence was that no one at CAPMARC had viewed that document at that time. It wasn't seen until 2008, at which time it raised issues, which was what precipitated this lawsuit. But again, as the Bankruptcy Appellate Panel found, and as the Bankruptcy Court found, that all the other indices of fraud there and all the other chances to avert this problem lie with Bayview and with Transnation. And Bayview is charged with the imputed knowledge of what Transnation knew or should have known. And they didn't take reasonable steps to review the loan documents, to contact the new lender, to verify the payoff statement. There were things on the face of the payoff statement that itself should have made it evident that there was a problem here. And again, it's... Thank you. Thank you, Your Honor. Just a couple of closing points. If there was an escrow check that comes in to the trust, one possible explanation being given is it might be another sale of real estate. Well, let's run that one to ground. Let's say the trust receives an escrow check and they're going to reject the money. Whoever it was that's the other part of that escrow is going to want to know where their money came from. So if the debtor sells property to another party and gets $1.15 million from it and sends it in and that money is going to be rejected, gosh, do you want to give it to the debtor or do you want to give it back to the escrow from whence it was received? Either way, there's a problem. There was a comment that the borrower never said it was Bayview's money. And I get that. But the record is completely devoid of any indication that when the trust received this they asked the borrower, well, where did you get it? Whose money is it? They didn't ask that. There was discussion about industry standards with regard to do we cash the check and put it in a suspense account. Well, no, wait a minute. The trial court didn't make any finding on that. Sure, the trust presented expert testimony, but we did, too, and it was to the contrary. When a check like this comes in, the last thing you do is cash it, pay yourself and give the money back to the debtor. That was our expert's testimony. And the trial court didn't have to resolve that issue to decide this case. And didn't rule on it? I'm sorry? And did not rule on it? And did not rule on that. And then it resolved the case without ruling what standard practice was. That's it. Thank you. Okay. Thank you. The case is now submitted. We are adjourned.
judges: Benson, Kozinski, Graber